# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **APRIL L. SWINDLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-12-61-FHS-SPS** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

The claimant April L. Swindle requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). The claimant appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. As discussed below, the undersigned Magistrate Judge RECOMMENDS that the Commissioner's decision be REVERSED and the case REMANDED to the ALJ for further proceedings.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity (RFC) to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born on April 1, 1982, and was twenty-eight years old at the time of the administrative hearing. She has a high school education and past relevant work as a baker's helper (Tr. 21). The claimant alleges that she has been unable to work since November 6, 2008, because of a ventricular shunt (Tr. 151).

## Procedural History

The claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, on November 7, 2008. The Commissioner denied her application. ALJ Trace Baldwin held an administrative hearing and determined that the claimant was not disabled in a written opinion dated November 16, 2010. The Appeals Council denied review, so this opinion is the Commissioner's final decision for purposes of appeal. 20 C.F.R. § 404.981.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to lift/carry 10 pounds frequently and 10 pounds occasionally, stand/walk for two hours in an eight-hour work day, and sit for six hours in an eight-hour work day (Tr. 16). He further concluded that claimant could balance only occasionally (prohibiting work on slippery, wet, moving, or

narrow surfaces) and had limited depth perception (Tr. 16). The ALJ found that the claimant was not disabled because there was other work the claimant could perform in the national economy, *i. e.*, order clerk and cutter/paster (Tr. 22).

### Review

The claimant contends that the ALJ erred: (i) by failing to properly evaluate the impact of claimant's mental health impairments on her ability to work and (ii) by failing to properly analyze the opinion of claimant's neurosurgeon Dr. Kurt Bangerter regarding claimant's limitations and ability to work. The undersigned Magistrate Judge agrees with the claimant's second contention.

The medical evidence reveals that claimant was diagnosed with a brainstem tumor in 1995, which resulted in the placement of a ventriculoperitoneal shunt (Tr. 220). In 2008, it was noted that the claimant's shunt had been replaced four times over the course of 13 years (Tr. 220). In August 2008, the claimant presented to the Wilson N. Jones Medical Center emergency room with complaints of daily headaches, feelings of doom, agoraphobia, and panic attacks (Tr. 206). On December 10, 2008, the claimant was admitted to the hospital for a malfunction of her shunt which was causing slit ventricle syndrome (Tr. 304). At that time, the claimant had complaints of worsening headache, lethargy, dizziness, nausea, and vomiting (Tr. 304). The claimant was discharged six days later following surgery to correct the malfunctioning shunt. In January 2009, Dr. Bangerter completed a form which indicated that the claimant was limited to sedentary work with no lifting over ten pounds, no bending below waist level, and no unsupported

walking (Tr. 254).  On February 27, 2009, the claimant was treated by Dr. Kurt Bangerter for complaints of posterior neck and mid-back pain resulting from a lock box of medication falling on her (Tr. 341).  She was also noted to be experiencing an unsteady gait, which apparently caused her to frequently hit her head (Tr. 341).  Dr. Bangerter opined in April 2009 that the claimant would not be able to return to work "for the foreseeable future" given her ongoing problems (Tr. 391).  In June 2009, the claimant was complaining of continuing headaches and involuntary movements, suggestive of tardive dyskinesia (Tr. 501).  Dr. Bangerter referred her back to neurologist Dr. Jose Matus for evaluation (Tr. 501).  On March 22, 2010, the claimant presented again at Dr. Bangerter's office with complaints of worsening headaches, diplopia, and balance and gait problems (Tr. 660).

The claimant began receiving treatment from neurologist Dr. Jose Matus as early as 2002 (Tr. 482).  On July 6, 2009, the claimant was evaluated by Dr. Matus (Tr. 418-for complaints of involuntary upper trunk movements, daily headaches, and unexplained cough (Tr. 418).  The claimant was noted to be without medical insurance to pay for medications for her medical conditions (Tr. 418).  On examination, Dr. Matus found that claimant had some abnormal dystonic upper trunk movements, a dry cough, and tendency to elevate her arms to her neck (Tr. 419).  Dr. Matus concluded that the claimant most likely suffered from tardive dystonia (a complication associated with Reglan, a medication claimant had taken previously) (Tr. 419).  Dr. Matus further concluded that the claimant was disabled, "unable to hold any type of job that requires answering,

writing, or typing," and had limitations related to her ability to lift and carry things because of the atypical movement associated with her diagnosis (Tr. 420). In November 2009, however, claimant reported that her dyskinesia was almost resolved, but that she was also experiencing migraine headaches and was given Topomax (for headaches), Pristiq (for anxiety), Soma (for bedtime muscle spasms), and Lortab (for pain) (Tr. 455-56). Dr. Matus partially completed a functional evaluation form, in which he opined that claimant could not effectively oppose the thumb to the finger tips or manipulate small objects (Tr. 454). Dr. Matus further found that claimant could grasp tools (such as a hammer) but would be unable to hold them due to her dyskinesia (Tr. 454). Dr. Matus completed a form entitled "Medical Assessment of Ability to Do Work Related to Activities (Physical)" on August 26, 2010 (Tr. 662). In that form, Dr. Matus opined that claimant could sit (upright), stand, and walk, respectively, for two hours in an eight-hour workday, lift under ten pounds (but not repetitively), and could not handle objects with either hand (Tr. 662). Dr. Matus wrote that claimant could not work an eight hour workday at any level and that her unpredictable arm movements would cause her to drop objects (Tr. 662).

The claimant began receiving mental health treatment at APS Healthcare on December 21, 2009 (Tr. 267). At that time, she was diagnosed with generalized anxiety disorder, depressive disorder, and agoraphobia and her GAF was assessed to be 51 (Tr. 267). The claimant reported that she had been raped through administration of Rohypnol in the past, but that she had a good home life with her husband and children (Tr. 276-77).

She continued receiving treatment for anxiety and panic attacks through June 2010, though claimant reported continuing panic attacks despite treatment (Tr. 645).

The claimant was referred to social security examining physician Dr. Sherman Lawton, M.D. for a neurology screening on December 2, 2009 (Tr. 485-86). Dr. Lawton opined that claimant's movements involving lifting her arms over her head in a stretching motion was "purely voluntary and not in any way suggestive of a true dyskinesia" (Tr. 486). Dr. Lawton cited his observations that claimant had no difficulty putting her shoes and socks on and had no involuntary movements around her mouth as support for his conclusion (Tr. 486).

Prior to the claimant receiving specialized mental health treatment, state reviewing physician Dr. Cynthia Kampschaefer, Psy.D., completed a Psychiatric Review Technique in which she opined that claimant had no medically determinable mental health impairment (Tr. 395-407).

State reviewing physician Dr. Penny Aber, M.D., completed a Physical Residual Functional Capacity Assessment on June 16, 2009. (Tr. 409-416). Dr. Aber found that claimant was capable of occasionally lifting/carrying ten pounds, frequently lifting/carrying less than ten pounds, standing/walking for two hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday (Tr. 410). Further, Dr. Aber concluded that claimant could only occasionally balance, which would prevent claimant from working on slippery, wet, narrow, or moving surfaces, and her depth perception was limited (Tr. 411-12).

A second Physical Residual Functional Capacity Assessment was completed by state reviewing physician Dr. Luther Woodcock, M.D. on December 4, 2009. (Tr. 489-496). Dr. Woodcock's findings were identical to Dr. Aber's findings, except that he did not find that claimant had visual limitations (Tr. 490-92).

The claimant testified at the administrative hearing that she involuntarily reaches and pulls her arm every two to three minutes, and she has to tie her arm down to stop it (Tr. 38). She stated that she sees a physician to manage problems with her shunt only when necessary because she has no medical insurance (Tr. 39). The claimant testified that she has problems with her balance and gait which cause her to fall and prevents her from going places alone (Tr. 40). She stated that she spends eighty percent of her time in bed and has problems with involuntary grimacing that she can control when she realizes that it is happening (Tr. 40, 44).

The claimant contends that the ALJ failed to properly analyze the treating physician opinion of Dr. Bangerter regarding her physical limitations. Medical opinions from the claimant's treating physician are entitled to controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [and] consistent with other substantial evidence in the record." *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). Even if a treating physician's opinions are not entitled to controlling weight, the ALJ must nevertheless determine the proper weight to give them by analyzing the factors set forth in 20 C.F.R. § 404.1527. *Id.* at 1119 ("Even if a treating physician's

opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in § 404.1527.'"), *quoting Watkins*, 350 F.3d at 1300.  The pertinent factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  *Watkins,* 350 F.3d at 1300-01 [quotation marks omitted], *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001).  Finally, if the ALJ decides to reject a treating physician's opinions entirely, "he must . . . give specific, legitimate reasons for doing so[,]" *id*. at 1301 [quotation marks omitted; citation omitted], so it is "clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight." *Id*. at 1300 [quotation omitted].

Dr. Bangerter offered two opinions of record: i) that claimant was limited to sedentary work with no lifting over ten pounds, no bending below waist level, and no unsupported walking and ii) that claimant could not return to work "for the foreseeable future" given her ongoing problems (Tr. 254, 391).  With regard to the opinion offered by Dr. Bangerter regarding claimant's functional limitations, the ALJ mentioned the opinion, but neither described the weight he was assigning the opinion nor weighed it in

accordance with the factors set out in 20 C.F.R. § 404.1527. Further, while the Commissioner's argument that Dr. Bangerter's opinion regarding claimant's ability to return to work was a non-medical opinion and was therefore not entitled to controlling weight under 20 C.F.R. § 404.1527(d) and Soc. Sec. R. 96-5p is correct, the ALJ never indicated that he was rejecting the opinion for that reason in his decision, which makes the Commissioner's argument on this point an improper post-hoc argument. *See, Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) ("[T]his court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself.") [citations omitted]. Moreover, the ALJ was still not entitled to *disregard* Dr. Bangerter's opinion that claimant could not return to work and must still explain why he chose not to adopt it. *See, Ramirez v. Astrue*, 255 Fed. Appx. 327, 333 (10th Cir. 2007) ("Because Dr. Davis's opinion that Mr. Ramirez was unable to work conflicts with the ALJ's determination that Mr. Ramirez could perform light work, we direct the ALJ to make specific findings on remand explaining why he did not adopt Dr. Davis's opinion. Although the issue of whether Mr. Ramirez was able to work is an issue reserved to the Commissioner, *see* 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1), the controlling rules nonetheless 'provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner.'") [unpublished opinion], *quoting* Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *2; *see also id.* at *5 (stating that "[medical source] opinions on [issues reserved to the Commissioner] must not be disregarded.").

Because the ALJ failed to properly analyze the treating physician opinions of Dr. Bangerter, the decision of the Commissioner should be reversed and the case remanded to the ALJ for further analysis. If such analysis results in any adjustments to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

In summary, the undersigned Magistrate Judge PROPOSES a finding that correct legal standards were not applied and the decision of the Commissioner is therefore not supported by substantial evidence, and accordingly RECOMMENDS that the decision of the Commissioner be REVERSED and the case REMANDED to the ALJ for further proceedings consistent herewith. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 13th day of March, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma